# United States Court of Appeals
## For the First Circuit

No. 14-2168

KURT WEST,

Plaintiff, Appellant,

v.

BELL HELICOPTER TEXTRON, INC., GOODRICH PUMP AND ENGINE CONTROL
SYSTEMS, INC., AND ROLLS-ROYCE CORPORATION

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, Chief U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

Joan A. Lukey, with whom Justin J. Wolosz and Choate, Hall &
Stweart, LLP were on brief, for appellant.
Brian M. Quirk, with whom Jonathan G. Mermin and Preti
Flaherty, PLLP were on brief, for appellee Bell Helicopter Textron,
Inc.
James C. Wheat, with whom Pierre A. Chabot and Wadleigh, Starr
& Peters, P.L.L.C. were on brief, for appellee Goodrich Pump and
Engine Control Systems, Inc.
Martha C. Gaythwaite, with whom Marie J. Mueller and Verrill
Dana, LLP were on brief, for appellee Rolls-Royce Corp.

August 21, 2015

**THOMPSON**, **Circuit Judge**.  For thousands of years, humanity has looked to the sky and dreamt of flying.  Philosophers and poets have had much to say on the subject, leaving in their wake a bevy of quotes and sayings about the beauty of flight.[1]  The Federal Rules of Civil Procedure, although elegant in their own way, have so far failed to inspire such devotion.

Though this case arises out of a helicopter accident, our focus today is upon the Federal Rules, Rule 60(b)(3) in particular.  This rule, insofar as it concerns us here, allows a party to ask for a new trial on the grounds that an opponent has committed "misconduct" during discovery. Fed. R. Civ. P. 60(b)(3).  Plaintiff-Appellant Kurt West claims he should get a new trial because he discovered, several months after the jury's defense

---

[1] Plato, for example:

> The natural function of the wing is to soar upwards and carry that which is heavy up to the place where dwells the race of gods.  More than any other thing that pertains to the body it partakes of the nature of the divine.

Plato, Phaedrus.

Or Shakespeare:  "My soul is in the sky."  William Shakespeare, A Midsummer Night's Dream act 5, sc. 1.

Or how about Igor Sikorsky: "The helicopter approaches closer than any other (vehicle) to fulfillment of mankind's ancient dream of the flying horse and the magic carpet."  Igor Sikorsy the Aviation Pioneer Speaks, Sikorsky Archives, http://www.sikorskyarchives.com/IGOR%20SIKORSKY%20SPEAKS.php (last accessed August 20, 2015).

verdict, that the Defendants-Appellees[2] withheld discoverable information directly responsive to his document requests.

We do not determine today whether West gets a new trial. This is because, we believe, the district judge misconstrued the requirements of the Rule 60(b)(3) burden-shifting inquiry we set forth in Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988). We must, therefore, remand for further proceedings on West's Rule 60(b)(3) motion.

## I.  BACKGROUND

Because our concern is primarily with the application of Rule 60(b)(3), we need not give an extensive run-down of the factual background.  Many of the background facts necessary to shed light on the legal issue we have to deal with are uncontested. We'll set them forth as the jury could have found them, highlighting some of the contested areas as we go.[3]

## THE ACCIDENT

In December of 2008, West was a helicopter pilot in the employ of JBI Helicopter Services ("JBI").  JBI, based in New Hampshire, provides pilots and maintenance services for its clients' helicopters.  The helicopter at the center of this case

---

[2] Because so much of our focus is on what happened at trial, we refer to West as either West or "plaintiff" and the Appellees collectively as "defendants."

[3] In addition, much of what happened fits in nicely with time-honored aviation clichés.

is a Bell 407 manufactured by Bell Helicopter Textron, Inc. ("Bell"). With a machine as complex as a modern helicopter, Bell had some help in bringing the aircraft to life. Relevant here are Rolls-Royce Corporation ("Rolls-Royce"), which manufactured the engine, and Goodrich Pump & Engine Control Systems, Inc. ("GPECS") which made the 'copter's electronic control unit ("ECU"), itself a part of the digital engine controls.

On Monday, December 22, 2008, West was tasked with flying the 407 from a small airport in Connecticut back to JBI's facilities in New Hampshire. The weather over the preceding few days had not been good, with an early-winter snowstorm having hit New England. Indeed, on Saturday, December 20, another of JBI's pilot-employees was attempting to fly the helicopter up to New Hampshire but got caught in bad weather and had to land at the Danielson Airport in Connecticut. For various reasons, the 407 was left outside in the storm -- which raged all Saturday night, picked up again on Sunday and finally came to an end in the early morning hours on Monday -- instead of brought into a hangar.

So, before taking off on Monday, West and another JBI employee spent time clearing the accumulated snow and ice from the 407. That task completed to his satisfaction, West performed his pre-flight checks. Once assured of the 'copter's airworthiness, West took off to begin his journey back to New Hampshire.

- *Helicopters are really a bunch of parts flying in relatively close formation; all rotating around a different axis. Things work well until one of the parts breaks formation.*

For the first 45 minutes of flight, the 407 behaved just fine. But, it has been observed, if something hasn't broken on your helicopter, it's about to. Sure enough, West experienced one of those dreaded "moments of stark terror" when the 'copter's engine quit suddenly and without warning. He had on his hands what is known in aviation parlance as a "flame-out." And, although the 407 was equipped with an automated system intended to get the engine going again, it never started back up. Without fuel, pilots become pedestrians, and the 407 was going down. Even worse, the flame-out happened when West was over a residential area; he could see that many of the houses had been decorated for the upcoming Christmas holiday.

- *You can land anywhere once.*

Fortunately, West was able to keep the 407 from dropping like a stone by entering into what's known as an "autorotation." Without getting deep into the aerodynamic principles, what happens is that as the helicopter descends, the air passing through its blades keeps them spinning and produces lift. An autorotation does not produce enough lift to keep the helicopter in the air, but it does allow the pilot some amount of control over the descent and ultimate landing spot.

Once he'd gotten the autorotation going, West looked for a place to land. He didn't like what was directly in front of him, but fortunately he was able to reverse direction (performing what is known as a 180 degree autorotation) and come in along a road. West managed to avoid any houses or power lines and set the 'copter down -- hard -- in the middle of the street, across from a house. Though he had gotten it down on the ground, the 407 had experienced what is euphemistically called a "hard" (as opposed to "crash") landing. The helicopter suffered significant damage and never flew for JBI again, with it ultimately being sold for salvage.

- *Any landing you can walk away from...*

Besides being rough on the helicopter, the hard landing was not an especially good one for West. West was banged up, and emergency responders brought him to the hospital for observation, where he was kept overnight and not discharged until Christmas Day. Although he did not suffer any broken bones, West alleged that the extreme force exerted on his body (10Gs or more) exacerbated his preexisting gastrointestinal problems.

Later on, West was diagnosed with PTSD related to the accident. He explained to the jury that his PTSD interfered with his flying, as over time his symptoms worsened and he eventually

curtailed much of his flying activities.[4]  In addition, he experienced flashbacks, nightmares, and difficulty sleeping.

**THE TRIAL**

At trial, the parties presented the jury with vastly different theories to explain the engine's sudden shutdown.

West believes it was caused by a problem with the electronics.  His experts explained (and the defendants agreed) that Bell 407s are equipped with mechanisms intended to prevent the engine from rotating too quickly, a condition known as "overspeed."[5]  Should the engine begin to spin too fast, the electronic controls send a signal to a device known as the "overspeed solenoid."  The solenoid is basically an electrical switch coupled with a fuel valve, and fuel must flow through that valve before it reaches the engine.

When an electrical current reaches that solenoid, the switch activates and causes a plunger to close, which shuts the valve.  The valve is designed so that, even when closed, some fuel

---

[4] At oral argument before us, West's counsel represented to the Court that his symptoms had worsened to the point that he has now lost his pilot's license.

[5] For comparison, think of a car's tachometer, which tells the driver how fast the engine is spinning in terms of revolutions per minute.  A tachometer generally includes a red line showing the engine's maximum RPM.  An overspeed event in a helicopter can be thought of as "overrevving" or "redlining" a car's engine. Defense witnesses testified that helicopter overspeeds generally occur due to pilot input when the helicopter is operated under manual control.

is still able to get through and into the combustion chamber. With less fuel to burn, the engine speed begins to slow. Once the electronic controls "see" that the engine speed has been brought back under control (meaning the engine is no longer in "overspeed"), electricity stops going into the solenoid. Without electricity coming in, the plunger opens back up, restoring the full flow of fuel to the engine. At least, that's how it's supposed to work.

West theorized that his engine shutdown was caused by an unintended activation of the overspeed solenoid when, in fact, the engine was not spinning too fast.[6] Throughout trial, the parties referred to this phenomenon as false overspeed solenoid activation, or "FOSSA." FOSSA just means that the solenoid incorrectly "thought" the engine was spinning too fast and closed the valve.

At trial, West sought to convince the jury that his helicopter experienced FOSSA approximately 45 minutes into his flight. He claimed the FOSSA reduced the fuel flow enough and for a sufficient length of time so that the engine, no longer having enough fuel to stay lit, flamed out. It happened in the first place, West theorized, because one of the components[7] within the

---

[6] Returning to our car analogy, the engine speed had not reached the red line on the tachometer.

[7] It appears that during the discovery phase of the case West eventually settled on a specific component -- one of the ECU's

helicopter's electronic control system malfunctioned in a way that sent an electrical signal into the overspeed solenoid. And, due to the solenoid's design, any electrical signal will activate it and close the fuel valve.

West's liability expert, Peter Chen, took the position that normal fuel flow would not return once electricity ceased flowing into the solenoid, by which he meant that the valve would not open up again on its own. Chen opined that the system needed to reset itself once the engine overspeed had been eliminated. In West's case, however, because there was no genuine engine overspeed in the first place, the reset signal never went out.[8] Thus, the engine continued to operate on a restricted fuel flow, which ultimately turned out to be insufficient to keep the engine running and the helicopter aloft.

To further support West's theory, his experts pointed to other FOSSA incidents involving Bell 407s equipped with the same electronic controls. West argued that his incident was similar to those others, although with at least one significant difference:

_____

capacitors -- as the suspected cause of the problem. At trial the parties agreed, and the jury was told, that component testing never took place through no one's fault.

[8] According to Chen, the only way to reset the system and restore full fuel flow would have been for West to "turn off and turn on the engine."

in the other FOSSA events, the helicopter's incident recorder[9] showed that the overspeed solenoid had been triggered, while West's did not. Instead, the incident recorder in West's helicopter showed that everything was running fine up until the moment the engine shut off.

West's experts explained to the jury, however, that the incident recorder, instead of creating a continuous, uninterrupted record, takes "snapshots" of the system's status every 48 milliseconds.[10] If the recorder notes a problem with the helicopter or its electronics, it creates and saves a data log that could be reviewed and analyzed later. One of the things that would generally be recorded is an activation of the overspeed solenoid.

But, according to West's experts, not every activation of the overspeed solenoid necessarily shows up in the incident recorder's log. Specifically (and as the defense witnesses agreed), if the flow of electricity going to the overspeed solenoid shuts off after 24 milliseconds or less, such a short-lived event would not be recorded under any circumstances. And if the current had gone into the solenoid for up to 48 milliseconds (in other words, if it was activated for 48 or fewer milliseconds), it may

_____

[9] Think of it as a "black box" from a commercial airliner.

[10] The defendants explained that it had to work this way (as opposed to recording continuously and keeping a record of the entire flight) because the recorder is old technology and does not have enough system memory to keep a log of the entire flight.

or may not have shown up on the recorder. Whether or not a 48-millisecond or shorter signal would be noticed by the data recorder depends entirely on when the activation occurred with respect to the "snapshot" that preceded it.

On the flip side, an electrical signal of any duration, even one less than 24 milliseconds, would activate the solenoid and restrict the fuel flow.[11] And, per West's theory, the solenoid would remain activated, thereby continuing to deprive the engine of its normal fuel flow. In this way, West told the jury, his accident could have been caused by a FOSSA event even though the incident recorder did not show an activation of the overspeed solenoid.

Needless to say, the defendants took a different view. According to their experts, West's engine flameout was not caused by FOSSA, and West only thought it was because his experts didn't really understand how the overspeed solenoid worked. Indeed, a defense witness told the jury that Chen had been laboring under "some significant misunderstandings of the basic operation of the control system."

First, according to the defendants, the solenoid automatically opens back up once it's no longer being hit with an

---

[11] Provided, however, that the electrical current was 10 or more volts, but we really don't need to get into this level of technical minutia to decide this appeal.

electrical current. The experts told the jury that this is so because, once the solenoid is no longer actively keeping the plunger in the closed position there is nothing else holding it closed. Thus, the pressure of the fuel that had already been getting through forces the plunger back up and into the open position.

The defense experts did agree that an overspeed solenoid activation might not show up on the incident recorder until it had been activated for 48 milliseconds. A GPECS employee even testified that he believed it was "highly improbable, but possible" that a FOSSA event of less than 48 milliseconds could have occurred and yet escaped detection by the incident recorder. He went on to state, however, that any signal lasting 48 milliseconds or less would not have activated the solenoid for a long enough time to reduce the fuel flow to such an extent as to cause the engine to flameout.

Furthermore, the defense experts testified that, importantly in other FOSSA-based accidents, post-accident inspections revealed physical damage to at least one electronic component. Although the parties agreed that the components of West's helicopter had not (through no party's fault) been subjected to tests following West's accident, the defense experts did testify that there was no visible damage to any of the electronic

components.[12]   This lack of visible damage, they argued, distinguished West's accident from other known FOSSA events, making it less likely that his engine flamed out due to FOSSA.

In sum, the defense experts told the jury that West's accident had nothing to do with FOSSA, and that the engine could not have flamed out for the reasons West alleged.

The defendants did not content themselves with trying to poke holes in West's case, though.  Conceding that the engine did in fact suddenly shut down in the middle of flight, they offered the jury an alternative explanation.

The defense posited to the jury that the flameout was caused by the engine's ingestion of snow and ice.  To that end, the defendants put on evidence showing (and West himself admitted) that the helicopter had been left out overnight in a hazardous snow and ice storm.  They also testified that if a helicopter had to be left out overnight and exposed to the elements, certain protective devices should have been placed over the engine's intake to keep ice and snow from accumulating in and around the engine. These devices, which JBI owned, were not used on West's helicopter. The defendants faulted West for his de-icing procedures, arguing that the evidence showed that he used improper materials (e.g., rubbing alcohol and automotive windshield washing fluid), that he

_____

[12] Chen, West's expert, also agreed that no component failures were visible "[t]o the naked eye."

- 14 -

did not spend as much time de-icing the helicopter as he claimed, and that he rushed through the preparatory procedures.

Thus, the defendants urged the jury to find that West failed to adequately clear the helicopter of snow and ice before he took off that afternoon. As a consequence, about 45 minutes into the flight, the defense experts theorized, a chunk of ice broke off the helicopter (a defense expert compared it to ice breaking loose from a car's hood while on the highway) and was sucked into the engine. This chunk of ice, they told the jury, was enough to cause the flameout.[13]

Furthermore, while there was no visual evidence of any damage to electronic components (as had been present in other FOSSA events), the defendants claimed there was in fact physical evidence to corroborate ice ingestion. The jury was shown photographs of the engine's impeller blades showing that one of them had been bent. This was damage, the defense contended, resulting from the impact of a chunk of ice as it was sucked into the combustion chamber.

After deliberating for two days, the jury returned a defense verdict.

---

[13] This can happen, a defense expert explained, because snow or ice that gets into the engine turns into steam, which cools the combustion chamber. Sucking in snow or ice "also displaces air and it disrupts the balance of fuel and air in the combustion section. The result is a flame-out of the engine."

## WHY WE'RE HERE

The verdict came back on September 30, 2013. West moved for a new trial in October based on Federal Rule of Civil Procedure 59, asserting that he had been prejudiced by a variety of errors that occurred at trial. We do not need to address today any of the issues raised in this particular motion.

Then, on January 23, 2014 -- while West's Rule 59 motion was pending -- Rolls-Royce issued a "Commercial Engine Bulletin" applicable to the type of engine and ECU in West's helicopter. The Engine Bulletin described an "adapter" (which has its own part number) that the defendants had developed and which should be installed on Bell 407s. The adapter "modifies the overspeed protection system to reduce the likelihood of a false overspeed activation," or FOSSA. The Bulletin went on to provide detailed instructions for installing the adapter and for checking that the overspeed protection system continued to function as intended post-modification. The Bulletin further advised that its "[t]echnical aspects are FAA approved."

That same day, Bell issued its own "Alert Service Bulletin" for its 407s. Just like the Engine Bulletin, the Service Bulletin addressed FOSSA, too. It advised that "Bell Helicopter has been made aware of a potential condition where a false engine overspeed protection system activation could occur."

- 16 -

As Rolls-Royce's Engine Bulletin did, Bell's Service Bulletin directed "the installation of an overspeed adapter to reduce the likelihood of a false overspeed activation." Bell also "introduc[ed] a recurring functional check of the overspeed protection circuits within the Electrical Control Unit (ECU)." Following the explanatory material, the Service Bulletin provided the part number for the adapter and set forth several pages of instructions for its installation, as well as a diagram and "before and after" photographs. Moreover, "[t]he engineering design aspects" of the Service Bulletin had received governmental approval by "Transport Canada Civil Aviation."

West soon became aware of the Engine and Service Bulletins. Two weeks after their release, he filed a second motion seeking a new trial, this time invoking Rule 60(b)(2) and Rule 60(b)(3). These Rules provide the following:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party . . . .

Fed. R. Civ. P. 60(b).

- 17 -

In his motion, West argued that the fix described in the Bulletins demonstrated that a "circuit design error" existed at the time of West's accident and which rendered Bell 407s "susceptible to FOSSA." According to West, the Bulletins revealed that a particular circuit's design "inadvertently allows current to flow from the ECU [Electronic Control Unit] to the HMU [hydro mechanical unit] where the overspeed solenoid resides, thereby potentially activating the latter, i.e., a 'false overspeed activation.'" In sum, he said that it was now clear the circuit's design was defective because it "remain[ed] closed when it should be open." This constituted newly discovered evidence entitling him to a new trial, regardless of whether or not the defendants discovered the defect before, during, or after the trial of his case.

But West didn't stop there. He went on to argue that the technical nature of the information in the Bulletins, combined with the detailed fixes described therein and government approval of them, "compels" an inference that one or more of the defendants knew about the defect but failed to disclose it during discovery or at trial. Per West, "the passage of time between the end of trial and the issuance of the [Bulletins] is simply too short for the problem to have been discovered, a solution found and tested, and the [Bulletins] issued." In West's view, at least some of the defendants had to have been engaged in efforts to identify the

defect, design and test a solution, and prepare documentation long before trial began.

Failure to disclose this information, West said, constituted misconduct during the course of discovery -- misconduct which, he claimed, substantially interfered with the preparation and presentation of his case. Thus, West argued that he was entitled to a new trial pursuant to Rule 60(b)(3). Or, failing that, he asked for an evidentiary hearing to tease out "who knew what and when" about the defectively designed circuit, which he expected would assist the court in determining whether misconduct had occurred.[14]

The defendants submitted a joint opposition. They argued first that West's motion was "premised on a fundamental and self-serving misunderstanding of a technical document." Per the defendants, "FOSSA events result from failures of component parts in the engine's FADEC which result in errant closure of the overspeed solenoid."[15] Instead of revealing a new and previously-undisclosed mechanism by which FOSSA could occur, the Bulletins simply provided information about a "FAA-approved modification to

---

[14] West also argued that the defendants should have disclosed this information in response to certain questions at trial. Because we ultimately order a remand to address the defendants' discovery misconduct, we do not reach this argument.

[15] FADEC means "Full Authority Digital Engine Control." This system automatically (i.e., without the pilot's input) controls the flow of fuel into the helicopter's engine.

the overspeed protection system designed to remedy the existing and acknowledged FOSSA issue." The modification described in the Bulletins was intended to make FOSSA less likely to happen in the event of a component failure.

Having taken this position as to the import of the Bulletins, the defendants went on to argue that they do not constitute newly-discovered evidence under Rule 60(b)(2) because they "do not describe any sort of new cause of FOSSA." They also argued that there is no likelihood that this additional information would have had any impact on the outcome at trial because the defendants "presented a persuasive case that a FOSSA did not cause the accident and that Plaintiff's failure to properly de-ice his aircraft caused this accident." In returning a defense verdict, the defendants argued, the jury was unconvinced by West's position that his accident resulted from FOSSA.

With respect to the Rule 60(b)(3) new trial request premised on the defendants' alleged "misconduct," the defendants argued that West failed to meet his burden of showing misconduct by clear and convincing evidence. Because the Bulletins did not disclose a "new cause of FOSSA," the defendants argued that they did not improperly respond to any of West's discovery requests or withhold any responsive documents. The defendants also argued that information related to the Bulletins was not responsive to any of West's discovery requests and that, even if it was, West is

barred from obtaining relief because he failed to file a motion to compel after the defendants refused to answer certain interrogatories.

Finally, the defendants argued that even if the court were to consider the defendants to have committed "fraud or misconduct," West is still required to show by clear and convincing evidence that the misconduct substantially interfered with his ability to prepare for trial. West failed to make this showing, the defendants said, because the existence of the FOSSA phenomenon was well-known to West prior to trial. In fact, according to the defendants, "FOSSA events were the subject of thousands of pages of document production and deposition transcript taken by [West's] counsel," including "over a dozen depositions of GPECS and Rolls-Royce witnesses." In light of this "thorough record" regarding FOSSA, the defendants argued West failed to show "what or how evidence of the [Bulletins'] modification . . . could possibly have added to [his] case."

The district judge did not hold an evidentiary hearing. Ultimately, he released a lengthy written decision denying all of West's post-trial motions. Although the written decision disposed of a laundry list of issues, the only one we need concern ourselves with today is his resolution of the Rule 60(b)(3) new trial motion.

In denying this motion, the trial judge pointed out that Bell 407s' susceptibility to FOSSA "is not a new fact," as

information about FOSSA was disclosed in discovery and acknowledged by the defendants at trial. Furthermore, the jury was aware of FOSSA, as West's entire claim was that the defendants were aware of FOSSA, "but failed to properly remedy it." The judge also indicated that "the jury was not tasked merely with determining whether some defect existed in the defendants' products, but whether such a defect caused West's accident."

Embarking on his Rule 60(b)(3) analysis, the trial judge first assumed that "West could prove the defendants' culpability [in withholding discoverable information] by clear and convincing evidence." He stated in no uncertain terms that he "need not and does not decide" whether there was any such culpability. But, even assuming that the defendants culpably withheld their knowledge of the defect discussed in the Bulletins, the judge said that West would need to prove -- by a preponderance of the evidence -- that the misconduct substantially interfered with his ability to fully and fairly prepare for, and proceed at, trial. This, the judge said, West could not do.

The judge construed West's motion as disclaiming any argument that the modifications described in the Bulletins would have prevented his accident. Against this backdrop, the judge observed that "a party cannot obtain a new trial based on his adversary's failure to disclose irrelevant evidence, at least without a showing that the non-disclosure nevertheless

substantially interfered with the movant's trial preparation or presentation." West, in the judge's view, failed to make such a showing given that he was already well aware of the existence of the FOSSA phenomenon. Accordingly, he denied West's Rule 60(b)(3) motion.

This timely appeal followed.

## II. STANDARD OF REVIEW

We review the district court's resolution of a Rule 60(b)(3) new trial motion "solely for abuse of discretion." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 38 (1st Cir. 2013); Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988) (Rule 60(b)(3) motions are "addressed to the district court's sound discretion."). We utilize this deferential standard because we recognize "the trial judge's more intimate knowledge of the case." Anderson, 862 F.2d at 923. Accordingly, we will "reverse only if it plainly appears that the court below committed a meaningful error of judgment." Id. Nevertheless, and as the Supreme Court has put it, "[a] district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100 (1996); see also Golas v. HomeView, Inc., 106 F.3d 1, 3 (1st Cir. 1997) ("It is well-settled . . . that, when a district court makes an error of law, by definition it abuses its discretion.").

- 23 -

### III. ANALYSIS

Because this case involves the application of a specific Federal Rule of Civil Procedure, we start with an overall, aerial view of that particular rule before descending into the weeds of the parties' arguments.

### 1. Overview of Rule 60(b)(3)

Once again, and as relevant to our discussion today, Rule 60(b) provides the following:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party[.]

Fed. R. Civ. P. 60(b)(3).[16]  Although by its terms the rule sets forth multiple grounds on which a district court may grant relief, West's arguments only require us to talk about the last one, misconduct.  Fortunately, we are not without precedent in this area: <u>Anderson</u> v. <u>Cryovac, Inc.</u>, 862 F.2d 910 (1st Cir. 1988), went in depth into a Rule 60(b)(3) motion premised (as is alleged here) on an opposing party's misconduct in failing to disclose

---

[16] West also sought a new trial grounded upon "newly discovered evidence," <u>see</u> Fed. R. Civ. P. 60(b)(2), and he takes issue with the district judge's denial of that motion in this appeal.  Our Rule 60(b)(3) analysis, however, renders it unnecessary to consider Rule 60(b)(2) at this time.

certain materials that were responsive to discovery requests. See 862 F.2d at 922-23.

In Anderson, we recognized that a party's "[f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct' within the purview of" Rule 60(b)(3). Id. at 923 (citing Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir. 1978)). The concept of Rule 60(b)(3) "misconduct," we said, differs from fraud and misrepresentation. It is an expansive concept, as misconduct "does not demand proof of nefarious intent or purpose as a prerequisite to redress," and the term "can cover even accidental omissions." Id. All in all, "relief on the ground of misconduct may be justified 'whether there was evil, innocent or careless[] purpose.'" Id. (quoting Bros. Inc. v. W.E. Grace Mfg. Co., 351 F.2d 208, 211 (5th Cir. 1965)).

However, we do "not lightly . . . disturb[]" a jury verdict returned after a trial on the merits, so a complaining party must "demonstrate convincingly that [it] ha[s] been victimized by an adversary's misconduct." Id. at 924; see also Nansamba, 727 F.3d at 40 (recognizing that "the moving party must prove the culpable party's culpable misconduct by clear and convincing evidence"). And just showing that discovery misconduct has occurred is not enough to merit a new trial. The moving party must still demonstrate that such "discovery misconduct . . . substantially . . . interfered with the aggrieved party's ability

- 25 -

fully and fairly to prepare for and proceed at trial." Anderson, 862 F.2d at 924.

Substantial interference may be shown in at least two ways. First, the moving party may demonstrate "that the concealment precluded inquiry into a plausible theory of liability, denied it access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination." Id. at 925. Alternatively, "[s]ubstantial interference may also be established by presumption or inference." Id.

When figuring out whether a presumption of substantial interference should flow from the failure to make discovery, we consider the non-disclosing party's intent. After all, "[n]ondisclosure comes in different shapes and sizes: it may be accidental or inadvertent, or considerably more blameworthy (though still short of fraud or outright misrepresentation)." Id. Thus, "where concealment was knowing and purposeful, it seems fair to presume that the suppressed evidence would have damaged the nondisclosing party." Id. (collecting cases). And "[i]t seems equally logical that where discovery material is deliberately suppressed, its absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered with the aggrieved party's trial preparation." Id.

In the event that such a presumption of substantial interference arises, it "should be a rebuttable one." Id. To rebut the inference, the withholding party must adduce "clear and convincing evidence demonstrating that the withheld material was in fact inconsequential." Id. When the presumption is in play, rebutting it is critical for the withholding (i.e., the nonmoving) party: "[o]nce a presumption of substantial interference arises, it can alone carry the day, unless defeated by a clear and convincing demonstration that the consequences of the conduct were nugacious." Id. at 926.

## 2. The parties' positions

On appeal, the parties raise several arguments, but we really only need to address one of them.

West argues that the trial judge erred because he failed to apply what he describes as Anderson's "burden-shifting framework with respect to the intent of the non-moving party" in failing to disclose discoverable information. The judge, West says, failed to apply Anderson's presumption that intentionally "suppressed evidence would have damaged the nondisclosing party[,]" 862 F.2d at 925, thereby shifting the burden to the defendants to prove their misconduct did not result in any substantial interference. Instead, the district judge departed from Anderson by keeping the burden on West to prove substantial interference, and by requiring him to show the result of the trial

would likely have been different had the withheld material been disclosed. Thus, in West's view, the district judge's misapplication of Anderson "perpetuated the unfair effect of Defendants' non-disclosure on [his] ability to prepare for and participate in trial."

The defendants[17] say that the district judge did not abuse his discretion in finding that the nondisclosure -- even if it constituted purposeful misconduct -- worked no substantial interference with West's case. This is so, they argue, because the finding is supported by the clear and convincing trial evidence as outlined in their response to West's Rule 60(b)(3) motion. Simply put, defendants argue the Bulletins did not actually reveal

---

[17] GPECS is the only defendant to brief this issue. Bell and Rolls-Royce state in their briefs that they are adopting GPECS's arguments pursuant to Federal Rule of Appellate Procedure 28(i). When parties invoke this Rule, we generally determine whether the adopted argument really is readily transferable to the adopting party, or if the adopting party should have briefed the issue on its own. See, e.g., United States v. Brown, 669 F.3d 10, 16 n.5 (1st Cir. 2012) ("Adoption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case."); see also Putnam Res. v. Pateman, 958 F.2d 448, 462 (1st Cir 1992) (recognizing the existence of "limits to the ability of parties to adopt other parties' arguments"); United States v. David, 940 F.2d 722, 737 (1st Cir. 1991) (stating arguments must be "readily transferable" in order to be adopted pursuant to Rule 28(i)).

Here, at the trial court level, the defendants submitted a combined opposition to West's Rule 60(b) motion, and neither the district judge nor West took issue with this. And West does not complain about the defendants' taking a similar tack in this appeal. Accordingly, at least for today, we simply assume that Rolls-Royce and Bell have adequately adopted GPECS's arguments.

any information about Bell 407s or about FOSSA that West did not already have before trial.  The defendants further contend that West has specifically conceded that the adapter and modifications to the overspeed protection system described in the Bulletins would not have prevented his accident, foreclosing any possibility that the information could have affected the trial's outcome.

**3.  The district judge misapplied Rule 60(b)(3)'s framework**

After reviewing the extensive trial record, the parties' submissions to the trial judge regarding West's new trial motion, and the judge's lengthy written decision denying all of West's post-trial motions, we conclude the district judge erred in how he went about analyzing West's Rule 60(b)(3) motion.

Having already laid out how the inquiry is supposed to go, it is not difficult to see where the district court went awry. In considering West's argument, the district judge first assumed West could prove, by clear and convincing evidence, that the defendants culpably withheld relevant documents.  Making such an assumption on the first prong of a required multi-part showing in order to bypass it and delve into the merits of a later requirement is a common feature of judicial decisionmaking and is, in and of itself, unremarkable.  Indeed, in a case as complex and lengthy as this one, it is perfectly understandable why the district judge would want to follow this route.

But, after assuming West could fly through the turbulence of the first hurdle and show culpable misconduct, the district judge misconstrued and misapplied the next stage of the Anderson test. Having assumed the defendants culpably withheld their knowledge of the defect addressed by the Bulletins, the district judge should have gone on to presume the defendants' misconduct substantially interfered with West's trial preparation. He did not do this, though. Rather than shift the burden to the defendants to prove by clear and convincing evidence that the withheld material was inconsequential like Anderson requires, the judge erroneously placed the burden on West to show that disclosure of the information would likely have made a difference in the trial's outcome. This misstep is evident from the judge's written statement that even assuming culpable misconduct, West may not prevail unless he "also proves by a preponderance of the evidence that this misconduct 'substantially interfered with [his] ability fully and fairly to prepare for, and proceed at, trial.'"

In these circumstances, the judge's failure to draw a presumption of substantial interference despite assuming the existence of the defendants' culpable misconduct led him to place the burden of proof on the wrong party. This error of law necessarily constituted an abuse of discretion. We must, therefore, vacate the judge's denial of West's Rule 60(b)(3) motion and remand for further proceedings on it.

**4. Evidence of misconduct within the meaning of Rule 60(b)(3)**

Vacating and remanding means that the district judge should consider the entire motion with fresh eyes; a do-over, as it were. However, based on the record before us, including some developments that came about at oral argument, we make the following comments and observations.

As noted above, though failure to make discovery can constitute "misconduct" even when nondisclosure is careless or innocent, we do not ignore the nondisclosing party's motivation. Anderson, 862 F.2d at 925. Indeed, the reason behind a party's nondisclosure plays a big part in determining whether the moving party is able to take advantage of a presumption of substantial interference. "In the case of intentional misconduct, as where concealment was knowing and purposeful, it seems fair to presume that the suppressed evidence would have damaged the nondisclosing party." Id. (citing cases). If "discovery material is deliberately suppressed, its absence can be presumed to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered with the aggrieved party's trial preparation." Id. (citing cases).

Here, West argues that the defendants should have disclosed information and documents relevant to the Bulletins in response to his first set of Rule 34 Requests for Production of

Documents.[18]  The parties have not extensively briefed the threshold issues of whether any documents relating to the Bulletins actually exist and, if so which one or ones are responsive to these requests.

For West's part, this is likely because he does not know what documents may be in the hands of the defendants -- indeed,

---

[18] Request 7 to Bell Helicopter sought

> [A]ll documents, including but not limited to communications, investigative reports, and test results, relating to any other accident involving a Bell 407 helicopter and either (a) an alleged uncommanded shutdown or (b) an alleged fault, deficiency or failure of the ECU, HMU, or FADEC.

Request No. 7 to GPECS and Rolls-Royce was similar, but asked for these types of documents when an accident had occurred in any helicopter using the same type of engine as was present in West's 407.

Here's Request No. 8 to Bell Helicopter:

> All documents relating to whether, and under what circumstances, any Bell helicopter model that employs the same version of the ECU, HMU, and FADEC as the Subject ECU, Subject HMU, and Subject FADEC, may suffer (a) an uncommanded shutdown; (b) a fault, deficiency, or failure of the ECU; (c) a fault, deficiency, or failure of the FADEC; or (d) a fault, deficiency or failure of the HMU.

To see what West sought from Rolls-Royce, replace "any Bell helicopter model" with "any Rolls-Royce Engine." For GPECS, replace "any Bell helicopter model that employs the same version" with "any ECU, HMU, and FADEC of the same models as".

this is why "discovery" is aptly named. The defendants do not engage much with this issue either. Although at oral argument GPECS's counsel stated his belief that additional documents would not have been responsive to the first set of discovery requests, this argument appears nowhere in the defendants' brief. Instead, GPECS's brief spends time arguing that a further response is not called for by West's second Rule 34 request.

Without question, discovery in this case was technical, fact-specific, and at times contentious. It involved the filing of at least two motions to compel by the plaintiff, a motion for protective order by the defendants, and multiple informal discovery conferences with the district judge in an attempt to resolve the parties' differences short of motion practice. Furthermore, West's first motion to compel specifically asserted that the defendants had failed to completely respond to Requests 7 and 8, among many others. After the district judge struck the motion in favor of scheduling a discovery conference, it appears the parties were able to resolve their disagreement on these two requests. We are unable to discern the substance of that agreement, including whether the parties agreed to limit or modify the requests, from our review of the record.

From a commonsense standpoint, it is difficult to imagine that documents reflecting the process culminating in the development of the overspeed adapter as described in the Bulletins

did not reflect or discuss "whether" or "under what circumstances" the ECU, HMU, or FADEC either failed or was faulty or deficient so as to be responsive to West's request. But we cannot make this judgment from the record on appeal. Accordingly, we leave it to the district judge to determine whether additional documents are responsive to West's document requests. This task could, consistent with Anderson, be aided by additional fact-finding. See Anderson, 862 F.2d at 930 (remanding with instructions for the district court to conduct a factual inquiry into whether evidence had been "knowingly and deliberately concealed").

Assuming there are additional responsive documents that have not been produced, we reiterate that a party is under a continuing obligation to supplement its response to an interrogatory or request for production of documents should it "learn[] that in some material respect the disclosure or response is incomplete or incorrect, and if that additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). It is clear that none of the defendants served supplemental discovery responses or did anything else to make the plaintiff aware of additional information regarding FOSSA, as reflected in the Bulletins. Furthermore, at oral argument before us counsel for GPECS candidly acknowledged that information regarding the defendants' internal processes culminating in the

Bulletins' release was known to him and his client, but that he did not think he was obligated to disclose it.[19]

Thus, thanks to counsel's own admissions, there can be no doubt that the defendants failed to produce information not due to oversight, inadvertence, or counsel's own ignorance of its existence. Rather, the decision not to produce the information was a conscious, deliberate choice. But, the defendants say, their failure to turn over information does not qualify as discovery misconduct because they were not required to disclose it in the first place. They offer two reasons -- separate and apart from any argument about the information's responsiveness to West's discovery requests -- as to why this might be so.

First, counsel for GPECS stated at oral argument, in response to questioning from this Court, that he did not think he had to disclose it and explained his thinking:

> We did not feel that we had any obligation to make disclosure, . . . either before or at the time of trial because the development of the modifications set forth in the bulletins was in a very preliminary stage. In other words, it was being evaluated, initially tested and there wasn't anything at that point in time to be produced.

---

[19] This seemingly opens the door to Bell and/or Rolls-Royce separately arguing that GPECS alone committed discovery misconduct. But neither one says anything along these lines.

The argument, therefore, is that the information was withheld not because West failed to ask for it, but because the defendants' investigatory process had not been completed prior to trial.

This position is without merit. West's requests for production of documents sought documents relating to uncommanded engine shutdowns in Bell 407s and/or faults or failures of the Bell 407s' ECU, FADEC, or HMU -- failures of which, West alleged at trial, could bring about a FOSSA. Whether or not the defendants had gotten beyond a "preliminary" result in their process is irrelevant to whether or not information about the process and the ongoing pursuit of a fix was responsive to West's discovery requests. Accordingly, we conclude that the allegedly "preliminary" nature of the investigation did not relieve the defendants of their obligation to disclose information about it in response to proper discovery requests.

Second, in their brief the defendants argued that even if information about the modification and its development was originally discoverable pursuant to West's first Rule 34 request, West agreed during an on-the-record discovery conference to waive supplementation of his first set of Requests for Production.[20] According to the defendants, West agreed to serve a second set of

_____

[20] None of the defendants argued to the district court (or on appeal) that any of the information was properly withheld on the basis of privilege.

discovery requests specifically geared toward FOSSA in lieu of receiving supplemental responses to his first round of discovery requests. Not surprisingly, West contends such an agreement was never made.

We have reviewed the transcript of the discovery conference, which was called not in response to a motion to compel but to the defendants' motion for protective order focusing on the confidentiality of already-produced documents and resisting West's demands to produce certain documents regarding "tantalum capacitors" (a particular electronic component). We have been unable to find any statements of counsel waiving supplementation of West's first request for production of documents. And the defendants do not bring to our attention any specific statements, either. Nor have they pointed us to any other evidence in the record -- a written stipulation or correspondence between the parties' counsel, for example -- of the purported agreement. Furthermore, nowhere in the 65-page transcript of the discovery conference did the defendants argue, or the judge indicate, that there was anything improper about West's discovery requests.

On appeal, defendants only contend -- and in conclusory fashion at that -- that West's second request for production "superseded" any obligation the defendants may have had to supplement their responses to the first request. But this is nothing more than wishful thinking, as the defendants have

presented us with no authority for the proposition that serving a subsequent discovery request relieves a party from its obligation to supplement its prior discovery responses.

Moreover, it is plain from the transcript of the discovery conference that, based on defendants' position that particular documents regarding tantalum capacitors were not responsive to the first round of requests and since discovery was still open, the parties agreed that West would simply serve a new, more focused, document request. In this way, the parties cut short a fight over whether the documents should have been produced in the first instance. As near as we can tell, the resolution of this specific conflict had no bearing whatsoever on the defendants' continuing obligation to provide supplemental responses to West's first set of discovery requests, none of which had been determined to be improper.

Accordingly, we reject as unsupported (in the record or our caselaw) the defendants' assertion that West waived the right to supplemental responses to his first request for production.

In light of this conclusion, it follows that the defendants have not presented us with a valid reason for deliberately withholding discoverable information. On remand, should the district court in fact determine that additional documents within the defendants' possession were responsive to West's first set of Requests for Production, this record supports

a finding of culpable misconduct within the meaning of Rule 60(b)(3), thereby raising the presumption of substantial interference. Whether the defendants are able to rebut this presumption (if it arises) by clear and convincing evidence is a question on which we take no position.

## IV. CONCLUSION

Based on the foregoing, we conclude that the district judge committed an error of law in his application of Rule 60(b)(3) by placing the burden on West to prove substantial interference in spite of his assumption that the defendants culpably withheld materials that should have been produced in discovery. Because the judge erroneously placed the burden on the wrong party, we must remand to the district court for further proceedings. Accordingly, we vacate the district judge's denial of West's Rule 60(b)(3) motion and remand this matter to the district court for further proceedings in accordance with this opinion. Costs to West.[21]

**Vacated in part and remanded.**

---

[21] One final point. The conclusion of West's brief asks that this matter be assigned to a different judge. Assuming that such a terse request is sufficient to raise the issue, we construe it as seeking a new judge should we order a new trial. As we are not ordering a new trial, we need not take up the request at this time.